UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **DIANDREA CARTER,** | } |
| Plaintiff, | } |
| v. | } Case No.: 5:21-cv-00088-MHH |
| **CAPITAL LINK MANAGEMENT LLC, et al,** | } |
| Defendant. | } |

# MEMORANDUM OPINION AND ORDER

In this Fair Debt Collection Practices Act action, DiAndrea Carter alleges that Capital Link Management, LLC, a debt collector, violated the FDCPA.[1] Ms. Carter contends that Capital Link violated the FDCPA because when it contacted her – via a text message and several alleged telephone calls – to collect a debt on behalf of Mountain Run Solutions, LLC, she was a party to Chapter 13 bankruptcy proceedings in which the alleged debt was listed. Capital Link contends that its text message to Ms. Carter did not violate the FDCPA because the text message was not an attempt to collect a debt. Alternatively, with respect to the text message, Capital Link argues that it made a bona fide error that excuses liability under the FDCPA.

---

[1] Ms. Carter also asserts claims for FDCPA violations against Mountain Run Solutions, LLC, the creditor. Ms. Carter moved for summary judgment only against Capital Link.

Capital Link also contends that it did not call Ms. Carter. Ms. Carter has asked the Court to enter judgment in her favor on her claims against Capital Link. (Doc. 27). This opinion resolves Ms. Carter's motion for summary judgment.

This opinion begins with a discussion of the standard that a district court uses to evaluate motions for summary judgment. Then, consistent with the summary judgment standard, the Court identifies the evidence that the parties have submitted, describing the evidence in the light most favorable to Capital Link. Finally, the Court evaluates the FDCPA claims against Capital Link.[2]

## I.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that a genuine dispute as to a material fact precludes summary judgment, a party opposing a motion for summary judgment

---

[2] In her amended complaint, Ms. Carter asserted three FDCPA claims: demanding payment of a debt included in a bankruptcy proceeding under 15 U.S.C. § 1692e, (Doc. 21, pp. 8-9); failure to cease communications and cease collections under 15 U.S.C. § 1692c(c), (Doc. 21, pp. 9-10); and communicating with a consumer represented by counsel under 15 U.S.C. § 1692c(a)(2), (Doc. 21, pp. 10-11).

As discussed in greater detail below, these claims arise out of two alleged, distinct attempts by Capital Link to collect Ms. Carter's alleged debt. First, Capital Link sent a text message to Ms. Carter on October 29, 2020. (Doc. 21, p. 5, ¶ 13). Next, Capital Link allegedly called Ms. Carter's cellphone four times in mid-December 2020. (Doc. 21, pp. 5, 6, ¶¶ 15, 16). In evaluating Ms. Carter's FDCPA claims against Capital Link, the Court begins with the FDCPA claims arising out of the October 29, 2020 text message and then turns to the FDCPA claims arising out of the alleged mid-December telephone calls.

must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences from the evidence in the light most favorable to the non-moving party. *Sconiers v. Lockhart*, 946 F.3d 1256, 1260 (11th Cir. 2020). Accordingly, the Court views the evidence in the light most favorable to Capital Link and draws all reasonable inferences from the evidence in its favor.

## II.

Ms. Carter bought a Vivint home security system. (Doc. 27-2, p. 2, ¶ 2). In 2016, Ms. Carter transferred the home security system to her former boyfriend. (Doc. 27-2, p. 2, ¶ 2). At some point after Ms. Carter transferred the home security system, her account went into arrears. In 2018, "a debt buyer and debt collector, Mountain Run Solutions [], began sending [Ms. Carter] collection letters regarding

a purported debt owed to Vivint." (Doc. 27-2, p. 2, ¶ 3; *see also* Doc. 27-5, p. 2).[3] It can be reasonably inferred from the record that Mountain Run Solutions purchased Ms. Carter's alleged debt from Vivint.

On May 11, 2018, Ms. Carter filed a Chapter 13 bankruptcy petition in the Northern District of Alabama Bankruptcy Court. (Doc. 27-2, p. 2, ¶ 4). Ms. Carter included the alleged debt in her bankruptcy petition schedule. (Doc. 27-2, p. 3, ¶ 5).[4]

Pursuant to a collection agreement between Mountain Run Solutions and Capital Link Management, (Doc. 27-3, pp. 7-9), Mountain Run Solutions assigned Ms. Carter's account to Capital Link for collection, (Doc. 27-6, p. 5, ¶ 10). On October 29, 2020, Capital Link sent the following text message to Ms. Carter:

> Diandrea Carter Capital Link Management now handles your Vivint Alarm Reporting on Credit as Mountain Run Solutions account. This communication is from a debt collector, this is an attempt to collect a debt. Please go to the link for more details https://yng.link/BY340406bq. Questions please call 1 833 906 2937.

---

[3] Ms. Carter contends that she transferred "financial responsibility for the security system" to her former boyfriend and "satisfied any further obligations that [she] might have had to Vivint" when the security system was transferred. (Doc. 27-2, p. 2, ¶ 2). The question of whether Ms. Carter owed a debt to Vivint is not before the Court.

[4] According to Ms. Carter, while she did not believe that she owed a debt to Mountain Run Solutions, she included the debt in her bankruptcy petition schedule "out of an abundance of caution" because Mountain Run Solutions was attempting to collect the debt from her. (Doc. 27-2, p. 3, ¶ 5).

(Doc. 27-3, p. 13). Ms. Carter responded: "Stop harassing me. This is settled in my bankruptcy. I will be turing *[sic]* this over to my attorney…." (Doc. 27-3, p. 13). Capital Link wrote back:

> Capital Link Management: You have opted out and will no longer receive messages from this service. Reply RESUME to subscribe. Contact 12162901254

(Doc. 27-3, p. 13).

On December 9, 2020 and December 12, 2020, Ms. Carter missed two telephone calls from 855-978-4336. (Doc. 27-7, p. 4). On December 14, 2020 at 6:49 p.m., Ms. Carter answered a telephone call from 855-978-4336. (Doc. 27-7, p. 4). This telephone call lasted two minutes and eight seconds. (Doc. 27-7, p. 4). The 855-978-4336 telephone number is labeled in Ms. Carter's cellphone as "Capital Link (Vivint)." (Doc. 27-7, p. 4). Capital Link denies association with this telephone number. (Doc. 52-2, pp. 4-5, ¶ 14).

Ms. Carter contends that she called Capital Link on December 14, 2020, using telephone number 855-978-4336. (Doc. 27-2, p. 3, ¶ 11). Capital Link agrees that Ms. Carter called the company that day, but she did not call the 855-978-4336 number. (Doc. 52-2, p. 5, ¶ 16). According to Capital Link's records, Ms. Carter called 216-290-1254 from her cell number 256-566-1005. (Doc. 52-2, p. 5, ¶ 16; Doc. 53, p. 5, ¶ 17). Ms. Carter spoke with Luke Eckert, a Capital Link employee:

> [Mr.] Eckert: Good afternoon this is Luke Eckert with Capital Link Management, calls may be monitored and/or recorded how are you?

[Ms.] Carter:  Yes – someone is uh is keep calling this number.

[Mr.] Eckert:  Do you want me to remove it; would you like me to remove the number?

[Ms.] Carter:  Say what now?

[Mr.] Eckert:  Would you like me to remove the number?

[Ms.] Carter:  Ya[.]  Who are ya'all trying to reach?  I mean because ya'all been keep calling the last few days or whatever.

[Mr.] Eckert:  Give me one second – long pause – da DiAndra DiAndrea?

[Ms.] Carter:  Yes speaking.

[Mr.] Eckert:  Give me one second, are you able to verify date of birth?

[Ms.] Carter:  Ya, [REDACTED DOB].

[Mr.] Eckert:  I appreciate that my name is Luke Eckert with Capital Link Management we are actually reaching out regarding a file we have in our office that we are trying to resolve with you umm but first I have to make you aware that this call may be monitored and/or recorded this is a communication with a debt collector this is an attempt to collect a debt so any information we obtain only used for that purpose but we are calling regarding your Vivant Alarm account.

(Doc. 27-4, p. 2).  Ms. Carter told Mr. Eckert that she had filed for bankruptcy.  (Doc. 27-4, p. 3).  Mr. Eckert told Ms. Carter that he would update her account to reflect that she filed for bankruptcy.  (Doc. 27-4, p. 3).  This telephone call lasted three minutes and forty-one seconds.  (Doc. 52-1) (audio recording of the telephone call).

On December 15, 2020, Ms. Carter missed a telephone call from 877-255-6172. (Doc. 27-7, p. 5; Doc. 27-1, p. 3, ¶ 3). This telephone number is listed in Ms. Carter's cellphone as "Capital Link (Vivint)." (Doc. 27-7, p. 5). Capital Link denies association with this telephone number. (Doc. 52-2, pp. 4-5, ¶ 14).

Capital Link Chief Operating Officer Jonathan Rinker testified that if an "account owner was in bankruptcy, the account would not be sent [from Mountain Run Solutions to Capital Link] for collection." (Doc. 52-2, p. 3, ¶ 6).[5] To ensure it

---

[5] Ms. Carter has moved to strike Mr. Rinker's affidavit, arguing that he is "a witness who was not disclosed by [Capital Link] in discovery, and [his] testimony contradicts [Capital Link's] responses to Ms. Carter's written discovery requests." (Doc. 59, p. 1). Under Rule 37 of the Federal Rules of Civil Procedure:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless.

FED. R. CIV. P. 37(c)(1). Ms. Carter demonstrated that Capital Link failed to identify Mr. Rinker, as required by Rule 26(a) or (e), before filing its opposition brief. (Doc. 59, pp. 2-4). "The burden rests upon the non-producing party to show that its actions were substantially justified or harmless." *Carr v. AutoZoner, LLC*, 501 F. Supp. 3d 1237, 1240 (N.D. Ala. 2020) (quotation marks omitted). Here, as in *Carr*, Ms. Carter does "not explicitly contend that the late disclosure prejudiced [her]," so the omission appears harmless. *Carr*, 501 F. Supp. 3d at 1241.

Mr. Rinker's affidavit contains 18 paragraphs. After the introductory paragraphs, (Doc. 52-2, p. 2, ¶¶ 1-3), Mr. Rinker testified about two topics. First, Mr. Rinker spoke about Capital Link's relationship with Mountain Run Solutions. (Doc. 52-2, pp. 2-4, ¶¶ 4-10). Mr. Rinker explained that Capital Link "learned [that Mountain Run Solutions] performed background scrubs on the accounts it assigned" and relied on those background scrubs. (Doc. 52-2, pp. 2, 3, ¶¶ 5, 6). Mr. Rinker's testimony on this point speaks to the bona fide error defense and is relevant only to Ms. Carter's FDCPA claims concerning the October 29, 2020 text message. As the Court will explain below, Mr. Rinker's testimony on this point is not helpful to Capital Link. Thus, the Court denies Ms. Carter's motion to strike as moot with respect to paragraphs four through ten—the portion of the affidavit focused on the bona fide error defense.

Second, Mr. Rinker explained that neither of the telephone numbers from which Ms. Carter received calls in mid-December are associated with Capital Link. (Doc. 52-2, pp. 4-5, ¶¶ 13-18).

does not run afoul of the FDCPA, Capital Link learned that Mountain Run Solutions "performed background scrubs on the accounts it assigned, prior to assignment, to detect potential problem accounts, specifically including a search of existing bankruptcies." (Doc. 52-2, p. 2, ¶ 5). Accordingly, Capital Link assumed that an account it received from Mountain Run Solutions "had been checked for bankruptcy and the debtor was not in bankruptcy." (Doc. 52-2, p. 3, ¶ 6).[6]

Capital Link is not aware of an account, aside from Ms. Carter's, that was received from Mountain Run Solutions and was the subject of a bankruptcy

---

These telephone numbers are not mentioned in the complaint or in the attached exhibits. Instead, the complaint alleges only that Capital Link called Ms. Carter several times in mid-December. (Doc. 21, pp. 5-6, ¶¶ 15-16). Accordingly, Capital Link was not initially on notice of a potential dispute as to whether Capital Link operated the telephone numbers at issue, and it is reasonable that, as part of its initial disclosures, Capital Link may not have thought to disclose the identity of a witness who could speak to which telephone numbers Capital Link does and does not operate. Capital Link's failure to initially disclose is substantially justified because this issue only became apparent during discovery. Thus, the Court denies Ms. Carter's motion to strike with respect to paragraphs 13 through 18—the portion of the affidavit in which Mr. Rinker asserts that Capital Link is not associated with the telephone numbers.

Finally, the Court has not relied on Mr. Rinker's testimony at paragraphs 11 and 12 because that information appears elsewhere in the record. Thus, Ms. Carter's motion to strike with respect to paragraphs 11 and 12 is moot. (Doc. 52-2, p. 4, ¶¶ 11-12).

As to Ms. Carter's second argument, the Court "must be careful to distinguish 'between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.'" *Faulk v. Volunteers of America*, 444 Fed. Appx. 316, 318 (11th Cir. 2011) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)). Discrepancies between Mr. Rinker's testimony and Capital Link's earlier responses to Ms. Carter's request for production and interrogatories do not create a transparent sham.

[6] This procedure is not outlined in the collection agreement between Mountain Run Solutions and Capital Link. (Doc. 27-3, pp. 7-9).

proceeding. (Doc. 52-2, pp. 3-4, ¶ 9).[7] Moreover, Mr. Rinker asserts that if Mountain Run Solutions "found an assigned account was later included in bankruptcy, it would recall the account," and Capital Link "would cease all contact and communication with the debtor." (Doc. 52-2, p. 3, ¶ 7).

### III.

Under the Fair Debt Collection Practices Act, "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. The United States Court of Appeals for the Seventh Circuit has explained:

> [a] demand for immediate payment while a debtor is in bankruptcy (or after the debt's discharge) is "false" in the sense that it asserts that money is due, although, because of the automatic stay (11 U.S.C. § 362) or the discharge injunction (11 U.S.C. § 524), it is not.

*Randolph v. IMBS, Inc.*, 368 F.3d 726, 728 (7th Cir. 2004). Moreover, "a debt collector may not communicate with a consumer in connection with the collection of any debt if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address." 15 U.S.C. § 1692c(a)(2). Finally, "[i]f a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the

---

[7] Mr. Rinker noted that since 2019, Capital Link has received approximately 86,265 accounts from Mountain Run Solutions. (Doc. 52-2, p. 4, ¶ 9).

consumer, the debt collector shall not communicate further with the consumer with respect to such debt." 15 U.S.C. § 1692c(c).

### October 29, 2020 Text Message

Ms. Carter contends that the Court should declare, as a matter of law, that Capital Link's October 29, 2020 text message was a false representation under 15 U.S.C. § 1692e; an unlawful communication under 15 U.S.C. § 1692c(a)(2) because Capital Link knew Ms. Carter was represented by an attorney; and an unlawful communication under 15 U.S.C. § 1692c(c) because Ms. Carter had requested that the debt collector cease communications.

Capital Link argues that "[t]he text message made no effort to collect, assess or recover the debt." (Doc. 53, p. 12). Capital Link states that:

> there was no demand for payment, no threat of adverse consequences, no misstatement regarding the amount of the debt, and no representation as to its legal status. The text simply advised [that Capital Link] was now servicing the account, provide[d] contact information, and included the legally required disclosures under the FDCPA.

(Doc. 53, p. 11) (emphasis omitted). Capital Link's argument conflicts with the plain language of the text message, which states, in pertinent part: "This communication is from a debt collector, this is an attempt to collect a debt." (Doc. 27-3, p. 13). Moreover, the text message noted Ms. Carter's Vivint debt. (Doc. 27-3, p. 13). While Capital Link is legally obligated to inform Ms. Carter that it is a debt collector and that it is attempting to collect a debt, those words – no matter why

they were included in the message – convert Capital Link's communication into an attempt to collect a debt. And because Ms. Carter was in bankruptcy, Capital Link's attempt to collect the debt was a false representation because it "assert[ed] that money [was] due." *Randolph*, 368 F.3d at 728.

Capital Link argues that "there is still no liability under the FDCPA because the message was sent as a consequence of a bona fide error." (Doc. 53, p. 12). Under the FDCPA, debt collectors are liable "even when violations are not knowing or intentional." *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011) (citing *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1190 (11th Cir. 2010)). The FDCPA "affords a narrow carve-out to the general rule of strict liability, known as the 'bona fide error' defense." *Owen*, 629 F.3d at 1271 (footnote omitted). Under the FDCPA:

> A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

15 U.S.C. § 1692k(c); *see also Edwards v. Niagara Credit Solutions, Inc.*, 584 F.3d 1350, 1352-53 (11th Cir. 2009) ("A debt collector asserting the bona fide error defense must show by a preponderance of the evidence that its violation of the Act: (1) was not intentional; (2) was a bona fide error; and (3) occurred despite the maintenance of procedures reasonably adapted to avoid any such error."). "The

failure to meet any one of those three requirements is fatal to the defense." *Edwards*, 584 F.3d at 1353.

Viewing the evidence in the light most favorable to Capital Link, its error was not intentional. When it sent the text message, Capital Link was not aware that Ms. Carter had filed for bankruptcy or was represented by an attorney in connection with the debt. Moreover, Ms. Carter had not notified Capital Link in writing that she refused to pay the debt or that she wished communications to cease. Thus, Capital Link did not deliberately contact a debtor who had filed for bankruptcy, was represented by an attorney, was refusing to pay the debt, or wished communications to cease.

In *Edwards*, the Eleventh Circuit outlined the standard for determining whether an error is bona fide:

> As used in the Act "bona fide" means that the error resulting in a violation was "made in good faith; a genuine mistake, as opposed to a contrived mistake." *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 538 (7th Cir.2005); *see also Black's Law Dictionary* 186 (8th ed.2004) (defining "bona fide" as "1. Made in good faith; without fraud or deceit" and "2. Sincere; genuine"); *Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1246 (11th Cir.2008) ("When statutory terms are undefined, we typically infer that Congress intended them to have their common and ordinary meaning, unless it is apparent from context that the disputed term is a term of art."). To be considered a bona fide error, the debt collector's mistake must be objectively reasonable. *Johnson*, 443 F.3d at 729 ("[I]n effect, [the bona fide] component serves to impose an objective standard of reasonableness upon the asserted unintentional violation." (second alteration in original) (internal quotation marks omitted)).

*Edwards*, 584 F.3d at 1353. Viewing the evidence in the light most favorable to Capital Link, its error was objectively reasonable. Mr. Rinker testified that Capital Link knew that Mountain Run Solutions "performed background scrubs on the accounts it assigned, prior to assignment, to detect potential problem accounts, specifically including a search of existing bankruptcies," (Doc. 52-2, p. 2 ¶ 5); if Mountain Run Solutions "found an assigned account was later included in bankruptcy, it would recall the account," (Doc. 52-2, p. 3 ¶ 7); and that "but for this case there are no complaints against [Capital Link] where the Vivint account was already in bankruptcy when [Capital Link] made first contact," (Doc. 52-2, p. 4 ¶ 9). Accordingly, by virtue of Mountain Run Solutions having assigned Mr. Carter's account to Capital Link, it was objectively reasonable, on October 29, 2020, for Capital Link to believe that it could contact Ms. Carter without violating the FDCPA. Thus, Capital Link's error was bona fide.

"'[T]he procedures component of the bona fide error defense involves a two-step inquiry.'" *Owen*, 629 F.3d at 1273-74 (quoting *Johnson v. Riddle*, 443 F.3d 723, 729 (10th Cir. 2006)).

> The first step is "whether the debt collector 'maintained'—*i.e.*, actually employed or implemented—procedures to avoid errors." *Johnson*, 443 F.3d at 729; *Reichert*, 531 F.3d at 1006. The second step is "whether the procedures were 'reasonably adapted' to avoid the specific error at issue." *Johnson*, 443 F.3d at 729; *Reichert*, 531 F.3d at 1006.

*Owen*, 629 F.3d at 1274. "[T]his is a 'fact-intensive inquiry.'" *Owen*, 629 F.3d at 1274 (quoting *Wilhelm v. Credico, Inc.*, 519 F.3d 416, 421 (8th Cir. 2008)).

According to Capital Link, it relied on Mountain Run Solutions to perform "background scrubs on the accounts it assigned, prior to assignment, to detect potential problem accounts, specifically including a search of existing bankruptcies," (Doc. 52-2, p. 2 ¶ 5), and Capital Link relied on Mountain Run Solutions to recall "an assigned account [if it] was later included in [a] bankruptcy [proceeding]," (Doc. 52-2, p. 3 ¶ 7). Accordingly, Capital Link "has met the low threshold required by the first step because the evidence shows [Capital Link] has 'maintained'" its procedure of relying on Mountain Run Solutions. *Owen*, 629 F.3d at 1274.

However, Capital Link's procedure of relying exclusively on Mountain Run Solutions – with no internal controls – is not "reasonably adapted to avoid the specific error at issue." In *Owen*, the debt collector contracted with the creditor to assign accounts that are "validly due and owing." *Owen*, 629 F.3d at 1275. In holding that the debt collector was not entitled to the bona fide error defense, the Eleventh Circuit stated:

> [M]ost notably, [the debt collector] has not indicated any internal, error-correction procedures to avoid miscalculations of debt amounts, such as interest on past-due interest or extra fees beyond the debtor's unambiguous written agreement. [The debt collector] has not offered evidence of any training techniques it employs to foster FDCPA compliance. For example, [the debt collector] cited no evidence that it

> trains its employees to examine principal and interest to avoid compound interest errors, much less any internal procedures to segregate principal and interest to avoid collection errors. . . . In sum, [the debt collector] cited no internal controls it employs to reduce the incidence of improper debt collection. Rather, [the debt collector's] procedure is to outsource its oversight task to its creditor [], which must report only debts that are 'validly due and owing.'"

*Owen*, 629 F.3d at 1276 (internal footnote omitted). The same is true here. Capital Link, like the debt collector in *Owen*, "cited no internal controls it employs to reduce the incidence of improper debt collection," choosing instead to outsource its entire oversight operation to its creditor, Mountain Run Solutions.[8]

In *Owen*, the Eleventh Circuit held that "[e]mploying a one-time form contract with [the creditor] four years prior and blindly relying on creditors to send only valid

---

[8] In *Kottler v. Gulf Coast Collection Bureau, Inc.*, 460 F. Supp. 3d 1282 (S.D. Fla. 2020), the United States District Court for the Southern District of Florida granted the plaintiff's motion for summary judgment on her FDCPA claim. The United States Court of Appeals for the Eleventh Circuit affirmed, holding that the defendant was not entitled to the bona fide error defense because it lacked internal controls:

> [The defendant] implemented procedures that were not reasonably tailored to identify a debt covered by the worker's compensation law. [The defendant] relied on its clients to provide data that identified possible worker's compensation coverage, such as a listing of a common worker's compensation carrier, before investigating the status of the debt. [The defendant] used no additional screening procedures to detect if a debt was subject to worker's compensation before mailing a dunning letter. Because [the defendant] relegated "its oversight task to its creditor[s]" and lacked "internal controls . . . to reduce the incidence of improper debt collection," it was not entitled to avoid liability for a bona fide error. *See id.* 1276.

*Kottler v. Gulf Coast Collection Bureau, Inc.*, 847 Fed. Appx. 542, 544 (11th Cir. 2021) (quoting *Owen*, 629 F.3d at 1276). Capital Link, like the defendant in *Kottler*, lacked internal controls and relied on its client, Mountain Run Solutions, to screen out debts that were subject to bankruptcy proceedings.

debts is a procedure, but it is not one reasonably adapted to avoid the type of erroneous interest charges at issue here." *Owen*, 629 F.3d at 1275. Here, unlike in *Owen*, the creditor, Mountain Run Solutions, was not contractually obligated to assign only "validly due and owing" accounts to Capital Link. (Doc. 27-3, pp. 7-9). Instead, Capital Link appears to have relied only on an informal agreement with Mountain Run Solutions. Therefore, Capital Link's procedures were lacking compared to the debt collector in *Owen*.

There is a key difference between this case and *Owen*. In *Owen*, "the errors were discernible on the face of [the creditor's] documents" and were "therefore readily discoverable by" the debt collector. *Owen*, 629 F.3d at 1275. Here, there is no evidence before the Court that Ms. Carter's bankruptcy proceedings were discernible on the face of correspondence between Capital Link and Mountain Run Solutions. The Eleventh Circuit has stated that, "the FDCPA does not require debt collectors to independently investigate and verify the validity of a debt to qualify for the bona fide error defense." *Owen*, 629 F.3d at 1276. However, if Capital Link were allowed to adopt procedures without any internal controls, it would create a public policy issue that the Eleventh Circuit seeks to avoid:

> Debt collectors who presently maintain *internal* procedures to avoid FDCPA errors would be incentivized to scrap these measures altogether, since full immunity could be guaranteed by placing the onus of accuracy on creditors. This would precipitate a race to the bottom among debt collectors, rendering the FDCPA a dead letter.

*Owen*, 629 F.3d at 1277 (emphasis in *Owen*) (internal footnote omitted). Accordingly, Capital Link is not entitled to the bona fide error defense.

Thus, the Court finds that Capital Link's October 29, 2020 text message to Ms. Carter violated the FDCPA.

### *Mid-December 2020 Telephone Calls*

Ms. Carter contends that the Court should declare, as a matter of law, that Capital Link's alleged mid-December telephone calls were a false representation under 15 U.S.C. § 1692e; an unlawful communication under 15 U.S.C. § 1692c(a)(2) because Capital Link knew Ms. Carter was represented by an attorney; and an unlawful communication under 15 U.S.C. § 1692c(c) because Ms. Carter had requested that the debt collector cease communications. Capital Link concedes that, when Ms. Carter received the mid-December calls, it had knowledge of Ms. Carter's bankruptcy proceedings. (Doc. 53, p. 15). But Capital Link argues that "it did not place those calls." (Doc. 53, p. 16).

Ms. Carter produced cellphone screenshots of missed calls from 855-978-4336 and 877-255-6172. (Doc. 27-7, pp. 4-5). But Ms. Carter has not produced credible evidence showing that those two telephone numbers were assigned to Capital Link. In the screenshots, both telephone numbers are listed under the name "Capital Link (Vivint)," but Ms. Carter concedes that she created a "contact" for

both telephone numbers and manually added the name "Capital Link (Vivint)." (Doc. 60, p. 14 n.6).

Moreover, Ms. Carter alleges that "[o]n December 14, 2020 at 6:49 PM, [she] called 1-855-978-4336 to find out what the multiple missed calls had been regarding. [She] spoke with a collector named Luke [Eckert] who worked for Capital [Link]." (Doc. 27-2, p. 3, ¶ 11). According to the cellphone screenshots Ms. Carter produced, the outgoing call placed on December 14, 2020 at 6:49 p.m. lasted two minutes and eight seconds. (Doc. 27-7, p. 4). Capital Link has provided an audio recording of the telephone call between Ms. Carter and Mr. Eckert. (Doc. 52-1). That call lasted three minutes and forty-one seconds. (Doc. 52-1). Ms. Carter does not allege that she spoke with Mr. Eckert a second time. Capital Link's records show that the recorded call came from Ms. Carter's cell phone number. (Doc. 52-2, p. 5, ¶ 16). Thus, on current record, viewed in the light most favorable to Capital Link, Ms. Carter's outgoing telephone call on December 14, 2020 at 6:49 p.m. could not have been to Mr. Eckert at Capital Link.

While Capital Link styled its brief as a response in opposition to Ms. Carter's motion for summary judgment, Capital Link suggested that the Court should enter summary judgment in its favor. (Doc. 53, p. 20). Capital Link's response brief, dated April 20, 2022, was filed after the January 10, 2022 deadline for dispositive motions. (Doc. 19, p. 2, ¶ 3). Pursuant to Rule 56(f) of the Federal Rules of Civil

Procedure, "the court may grant summary judgment for a nonmovant" after notice and a reasonable time to respond. FED. R. CIV. P. 56(f)(1). As discussed above, the only evidence Ms. Carter produced demonstrating that Capital Link called her in mid-December – her testimony that she called 855-978-4336 and spoke to Mr. Eckert – is contradicted by other evidence in the record. The Court may discount a plaintiff's testimony on summary judgment if "it is blatantly contradicted by the record." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013). On or before July 26, 2022, Ms. Carter shall show cause why the Court should not enter judgment for Capital Link on her FDCPA claims concerning the mid-December calls.

## CONCLUSION

For the reasons discussed above, the Court enters judgment for Ms. Carter on her FDCPA claims concerning the October 29, 2020 text message.[9] The Court denies Ms. Carter's motion for summary judgment regarding the alleged mid-December telephone calls.

---

[9] For purposes of Article III standing, receipt of a single text message is sufficient to establish an injury-in-fact under the Federal Debt Collection Practices Act. *See Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192 (10th Cir. 2021) ("Though a single phone call may not intrude to the degree required at common law, that phone call poses the same *kind* of harm recognized at common law— an unwanted intrusion into a plaintiff's peace and quiet.") (emphasis in *Lupia*). In *Lupia*, the plaintiff did not answer the single telephone call and the debt collector left a voicemail about the debt. *Lupia*, 8 F.4th at 1188. The injury suffered from receipt of a single text message is tantamount to the injury suffered from receipt of a single voicemail.

**DONE** and **ORDERED** this July 12, 2022.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE